IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

VICTOR A. SEPULVEDA-VARGAS,

    Plaintiff,

        v.

CARIBBEAN RESTAURANTS LLC,

    Defendant.

Civil No. 13-1622 (SEC)

**OPINION AND ORDER**

Before the Court is Defendant's Motion for Summary Judgment on Plaintiffs' discrimination and retaliation claims under the Americans with Disabilities Act, 42 U.S.C. § 12102, *et seq.* (ADA), and several claims under Puerto Rico law. The motion is **GRANTED**.

### I.    Factual and Procedural Background

Caribbean Restaurants, LLC d/b/a Burger King (Caribbean) employs over 5,500 employees as part of its fast food restaurant chain in Puerto Rico. Plaintiff Victor Sepúlveda (Sepúlveda) started working for Caribbean on July 15, 2008, through the company's Fast Track Management Training Program. He was quickly promoted to assistant manager where he was responsible, among other things, for assisting and supervising other employees; making sure the restaurants were properly cleaned for opening and closing; and handling cash and inventory. As assistant manager, he had to work as required by operational and administrative needs. This meant working regular and irregular hours on weekdays, weekends, and holidays. He was also required to work in different restaurants and rotate shifts with other managerial staff, such as managers and sub-managers.

On February 28, 2011, Sepúlveda was assaulted and carjacked while attempting to make a bank deposit for Caribbean. After the incident, he went on leave of absence

to receive medical treatment from the State Insurance Fund (SIF). Sepúlveda's treating psychiatrist, Dr. Juan Fumero, diagnosed him with post-traumatic stress disorder and depression.

On November 9, 2011, the SIF released Sepúlveda to return to work while on treatment. Upon returning, he asked Francisco Salas (Salas)—the Area Manager in charge of supervising the restaurants where Sepúlveda worked—for an accommodation. The details surrounding this request and the agreement reached are heavily contested. Salas posits that that he agreed to assign Sepúlveda exclusively to the mid-shift for a period of three weeks, after which Sepúlveda would go back to rotating-shifts. Sepúlveda, on the other hand, alleges that he requested a fixed schedule—not necessarily the mid-shift—and to be assigned to a restaurant with a low incidence of crime.

It is unclear whether Sepúlveda intended his request to be permanent or temporary. Nevertheless, Sepúlveda claims that after three or four weeks it became evident that Salas was not going to grant his request. He therefore obtained a letter from the SIF evincing his need for the accommodation. The letter dated December 6, 2011, indicates that Sepúlveda was receiving treatment for an emotional condition and that the occupational physician recommended that he be assigned to a fixed-shift and that Caribbean should consider assigning him to a store with less risk of robbery. The letter states that this was necessary for Sepúlveda's medication treatment and that this was the only accommodation that could allow him to remain in the labor force. Docket # 41-1, pp. 91-92. Two days later, Sepúlveda submitted the letter directly to Zaimarie Rivera at the Human Resources' Department. This was the first written evidence of a disability and need for a reasonable accommodation that Sepúlveda provided to Caribbean. In that meeting, Rivera asked Sepúlveda to specify the duration of the accommodation, see Docket # 41-15, p. 1, but the record does not reveal whether he ever responded to that inquiry.

Sepúlveda alleges that, during a telephone conversation on December 10, 2011, Salas berated him for requesting the accommodation directly from Human Resources since Salas had already denied it. Salas also said that granting the request would be unfair to other employees and allegedly mentioned that Sepúlveda had taken four pills. Sepúlveda said that this made him feel humiliated. Docket # 41, ¶ 29 & Docket # 41-15. Days later, Sepúlveda went back for treatment at the SIF and returned to work on March 2012. Then, both parties agreed that Sepúlveda would work only in a restaurant located inside the food court of Plaza Centro Shopping Center in Caguas on a fixed-shift from 1:00 p.m. to 10:00 p.m. Although Caribbean initially understood that this accommodation was going to be temporary, see Docket ## 34-15 & 34-17, Sepúlveda remained assigned to the same restaurant and shift until he resigned on October 2013.

On April 20, 2012, Salas told Sepúlveda that all managerial employees had to attend a mandatory seminar later that month. Because the seminar started at 7:00 a.m. and was to take place in a remote location, Sepúlveda complained that his compulsory attendance violated his accommodation. After a heated discussion, Sepúlveda started crying and called his father to pick him up. He went on medical leave for some time and was ultimately excused from attending the seminar and from attending similar seminars on October 2012 and April 2013.

Caribbean requires all its managerial employees to have a valid certification on food handling approved by the Puerto Rico Department of Health. To comply with this requirement, all management staff had to obtain a so-called ServSave Certificate. On May 10, 2012, Salas notified Sepúlveda that he had to take a ServSafe course and examination scheduled for May 31 since his certificate had expired.[1] Docket # 34-21.

---

[1] Although the certificate says that it expires in five years, see Docket #41-10, Caribbean Restaurants contends that the Puerto Rico Department of Health requires the certificate to be renovated every three years. Id. While neither party has produced conclusive evidence as to the requirements set by the Puerto Rico Department of Health, it is uncontested that Caribbean Restaurants required that at least one employee per shift had to have a ServSafe certificate less than three years old and that only the managerial staff were certified. See Docket # 41-1, p. 63. The Court notes that the Frequently Asked Questions' section of the Food Handler Program on ServSafe's website states that the certification expires every three years. See https://www.servsafe.com/ss/help/foodhandler/en/index.aspx (last accessed on 9/30/2016). Moreover a google

Sepúlveda responded that he could not attend the course because it started at 8:00 a.m., and thus interfered with his fixed schedule. Sepúlveda then contacted Pier Vargas from Human Resources regarding this issue. She told him that he could not work without a valid certificate but that she would approve paid vacation leave until another course that did not interfere with his accommodation could be scheduled. Salas then enrolled Sepúlveda in another course scheduled for June 7 and 8. This course was ultimately cancelled and rescheduled. Sepúlveda passed the ServSafe examination later in June and returned to work immediately thereafter.

Since Sepúlveda's return to work from the SIF in March 2012 until his resignation in October 2013, several incidents occurred involving other employees and managerial staff, which are narrated with more detail in the sections below. According to Sepúlveda, these incidents were discriminatory and retaliatory, which prompted him to file two discrimination charges before the Equal Employment Opportunity Commission (EEOC) on June 15 and October 29, 2012. See Docket # 6, p. 4. During this time period and further into his tenure at Caribbean, Sepúlveda experienced financial difficulties and marital problems which eventually culminated in a divorce. He also tried to commit suicide on two occasions. The first was on August 2012. That time he was hospitalized and received Temporary Non-Occupational Disability Insurance benefits, until his return to work sometime around September 13, 2012. His second attempt was on February 2013. Sepúlveda eventually returned to work on March 21, 2013. See Docket # 59, ¶¶ 71–86.

On April 25, 2013, Dr. Fumero recommended Sepúlveda to abstain from work for six months, which he did, Docket # 59, ¶ 86, but never returned to work. On

---

search using the terms "ServSafe" and "Puerto Rico" produces several websites of entities that offer the course, which say that in Puerto Rico the license is valid only for three years. See e.g. http://www.asorepr.com/registro_servsafe (last accessed on 9/30/2016); and https://foodsafetycertificationpr.com/2016/09/15/curso-de-manejo-seguro-de-alimentos-santurce/ (last seen on 9/30/2016).

August 14, 2013, he filed this disability discrimination and retaliation suit bringing federal claims under the ADA and supplemental claims under Puerto Rico's counterpart to the ADA, Law No. 44 of July 2, 1995, P.R. Laws Ann. tit. 1, §§ 501 *et seq.*; the Commonwealth's anti-retaliation statute, Law No. 115 of December 20, 1991, 29 P.R. Laws Ann. § 194a(a); and Law No. 80 of May 30, 1976, which mandates compulsory severance pay for employees dismissed without cause. There, Sepúlveda alleged that Caribbean failed to comply with the reasonable accommodation that had been granted and that it retaliated against him by creating a hostile work environment. Two months after filing the complaint, Sepúlveda turned in his resignation letter stating his employment situation had become unbearable and therefore he had no choice but to resign.

On summary judgment, Caribbean sustains that Sepúlveda cannot establish a *prima facie* disability discrimination because he was not able to rotate shifts, which, according to Caribbean, is an essential function of an assistant manager at its restaurants. It also argues that it did in fact provide the accommodation requested and that Sepúlveda was not subject to any adverse action cognizable under either federal or Commonwealth discrimination laws.

**II.     Standard of Review**

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a "reasonable fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case." Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015). At this stage, it is axiomatic that courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), and must construe the record in the "light most flattering" to the nonmovant. Soto-Padró v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012). A court must similarly resolve all

reasonable inferences in favor of the non-moving party. Tolan v. Cotton, 134 S.Ct. 1861, 1863 (2014) (per curiam).

Once the movant properly configures a summary-judgment motion, the burden shifts onto the nonmovant—or "the party who bears the burden of proof at trial," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014)—to "point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). So the nonmovant cannot rest on conclusory allegations and improbable inferences. Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Technologies GmbH, 781 F.3d 510, 516 (1st Cir. 2015). Neither "effusive rhetoric," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997), nor "arguments woven from the gossamer strands of speculation and surmise," RTR Technologies, Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013), suffice to forestall the entry of summary judgment. Failure to shoulder this burden "allows the summary judgment engine to operate at full throttle." Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 223 (1st Cir. 1996).

### III. Applicable Law and Analysis

The ADA prohibits employers from discriminating against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The statute defines "qualified individual" as a person who, "with or without reasonable accommodation, can perform the essential functions" of the job. Id. §12111(8).

Refusing to provide a reasonable accommodation to a disabled employee is, of course, a form of discrimination. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016). To defeat a defendant's motion for summary judgment on a failure-to-accommodate claim, a plaintiff must show: (a) that he is disabled within the meaning of the ADA; (b) that he could perform the essential functions of his post either with or without a reasonable accommodation; and (c) that the employer, knowing of his disability, refused to reasonably accommodate him. See id. (citing Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)).

Here, Caribbean concedes that Sepúlveda was disabled within the meaning of the ADA. It argues, however, that he was not a "qualified individual" because he was unable to work in rotating shifts, which Caribbean sustains is an essential function of an assistant manager at its restaurants. Sepúlveda, on the other hand, does not challenge that he was unable to work rotating shifts, but asserts that this was not an essential function of his job.

a. Failure to accommodate

An employer "need not accommodate a disability by foregoing an 'essential function' of the employment position." Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998) (collecting cases). A function is considered essential if it is "fundamental," rather than "marginal" to a position. Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 75 (1st Cir. 2010). This analysis "involves fact-sensitive considerations and must be determined on a case-by-case basis." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002). "It is the employer's burden 'to come forward with some evidence' that a particular function is essential." Richardson, 594 F.3d at 76 (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005)).

The ADA's implementing regulations provide a non-exclusive list of evidence that the employer may present to meet its burden. To wit,

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2.

The first two derive from the ADA's mandate that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Consistent with this directive, the Court must give "substantial weight" to Caribbean's good-faith view of what the job entails. Richardson, 594 F.3d at 76. After all, judicial inquiry into essential functions "is not intended to second guess the employer or to require the employer to lower company standards," Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (quoting Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004)), but rather "to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth." Gillen, 283 F.3d at 25.

Here, it is uncontested that Caribbean considers rotating shifts an essential function of an assistant manager. Both parties agree that assistant managers substitute and relieve managers in other stores depending on the needs of each store, see Docket # 41-2, p. 6. According to Caribbean, rotating shifts is essential for the equal distribution of work between the managerial staff. See Docket ## 34-2, ¶ 12 & 41-3, p. 63. Sepúlveda concedes that the purpose of rotating shifts is the "fairness in the distribution of shifts between [the] managerial staff." Docket # 41, ¶ 32; Cf. Laurin, 150 F.3d at 59 (finding rotating shifts an essential function where some shifts were less desirable than others). Caribbean's good-faith belief that rotating shifts is an essential part of an assistant managers' job is consistent with the reason given by Salas when he first refused to give Sepúlveda a fixed-shift—that it would be unfair to the other managers.

That said, "the employer's good-faith view of what a job entails, though important, is not dispositive." Gillen, 283 F.3d at 25. Still, the bulk of the evidence supports Caribbean's position that rotating shifts was an essential function of an assistant manager. For instance, the job application that Sepúlveda signed when he

sought employment from Caribbean stated that the restaurant industry operated seven days a week and that its employees had to be able to work in different shifts and in different restaurants. Docket # 34-4, p. 2. Caribbean also submitted a newspaper ad listing the requirements of the position, including among others, availability to work in rotating shifts, and having a car in adequate conditions. Docket # 34-3.[2] Finally, Sepúlveda admitted that rotating shifts was part of his responsibilities. Indeed, as far as he could tell, this was the case for all the other assistant managers.[3]

Faced with this overwhelming evidence, Sepúlveda offers two parries. First, he points out that the Director of Human Resources thought that Caribbean was required by law to provide the requested accommodation. This may be true. But Sepúlveda does not provide any support for the proposition that an employer's belief that the law requires more than it actually does burdens the employer with a legal obligation to permanently treat an employee according to such mistaken belief. That Caribbean accommodated Sepúlveda does not mean that it conceded that rotating shifts was a "non-essential" function.[4] "To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers." Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001) (collecting cases). Second, Sepúlveda mentions that Caribbean has not conducted any studies to determine which functions are essential and which are not. Yet, nothing in the ADA or its implementing regulations suggests that an employer's determination of

---

[2] Sepúlveda makes much of the fact that Caribbean has an internal description for Assistant Managers, which is not handed to any managerial employee but still Caribbean chose not to submit it as evidence or produce it during discovery. He argues that "such a document could be revealing." Docket # 44, p. 8. But Sepúlveda cannot rely on unsupported speculation concerning the content of this document. If Sepúlveda thought that this document was so important, his situation "did not call for heroic measures but, rather, for a routine motion to compel," Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc., 730 F.3d 23, 27 (1st Cir. 2013), which he did not file.

[3] Sepúlveda said that there were some assistant managers that did not rotate at some point after he worked at the restaurant in Plaza 3. But when asked, he could not recall any names. See Docket # 41-1 pp. 12-13. This will not suffice.

[4] Sepúlveda was granted the accommodation despite his failure to address Caribbean's concerns regarding the duration of his request. See Docket ## 34-15 & 34-17.

which functions are essential to a particular job need be based on particular studies. To the contrary, under the ADA, an employer's good-faith belief is not only competent evidence that a particular function is essential; it also carries substantial weight in the analysis. See Richardson, 594 F.3d at 76; 42 U.S.C. § 12111(8).

Caribbean shouldered its burden of providing evidence that working rotating shifts was an essential function of assistant managers at its restaurant and Sepúlveda countered with nothing. Since Sepúlveda could not rotate shifts, Caribbean was under no obligation to accommodate him. See Laurin, 150 F.3d at 56. In spite of this, the record reveals that Caribbean did provide Sepúlveda with most, if not all, of the accommodations that he properly requested, regardless of the reasonableness of the request. But the Court need not address his argument to the contrary because Sepúlveda was not a "qualified individual" under the ADA, and that is enough to dismiss his disability discrimination claim. The Court now turns to Sepúlveda's retaliation claim.

    b.  Retaliation and Hostile Work Environment

Sepulveda also claims that Caribbean took various adverse employment actions against him. Given that these actions took place after Sepúlveda's request for a reasonable accommodation, Caribbean argues that these must be analyzed through the lens of a retaliation claim. Sepúlveda does not raise any objections on this front, and so the Court proceeds accordingly.

The ADA forbids retaliation "against any individual because such individual has opposed any act or practice made unlawful ... or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA." 42 U.S.C. § 12203. "This action is independent from, and 'may succeed[,] even where [a] disability claim fails.'" Figueroa Guzmán v. WHM Carib, LLC, --- F. Supp. 3d ---, 2016 WL 944257, at *4 (D.P.R. Mar. 14, 2016) (quoting Valle–Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011)). To establish a retaliation claim, a plaintiff must show that "(1) he

engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006). Here, Caribbean concedes that Sepúlveda's request for a reasonable accommodation and filing of charges before the EEOC are protected activities under the ADA. The Court thus evaluates whether Sepúlveda proffered sufficient evidence to establish that he suffered an adverse employment action that is causally linked to these protected activities.

The ADA's anti-retaliation provision protects individuals "not from all retaliation," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006), but from retaliation that produces a significant harm. See Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006). "[F]ederal employment discrimination laws do not establish 'a general civility code' for the workplace." Quiles-Quiles, 439 F.3d at 7 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). Neither do they guarantee "a working environment free from stress." Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986). "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suárez v. Pueblo Intl, Inc., 229 F.3d 49, 54 (1st Cir. 2000). And an "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68. To establish an adverse employment action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotations and citations omitted).

First, Sepúlveda complains that during a telephone conversation on December 2011, Salas scolded and talked to him in a loud voice for requesting the

accommodation directly from Human Resources after Salas had already denied it. Sepúlveda also says that he felt humiliated because Salas allegedly "accused" him of taking four pills, which made him feel like an addict. Although this incident is definitely linked to a protected activity, it is insufficient to sustain an adverse employment action. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 47 (1st Cir. 2003) ("a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws."). That Salas may have been angered and overreacted because Sepúlveda went over his head to request an accommodation, "while perhaps improper, does not by itself constitute an adverse employment action for purposes of a retaliation claim." De Jesus-Sánchez v. Taber Partners I, LLC, 551 F. Supp. 2d 136, 141 (D.P.R. 2007).

The next incident with Salas occurred more than five months later. On April 2012, Salas attempted to make a temporary change in schedule and store location so Sepúlveda could attend a manager's seminar in Guayama at 7:00 a.m.[5] All the managerial staff was required to attend this type of seminar twice a year. A heated discussion ensued after Sepúlveda complained that the change in schedule violated his accommodation. According to Sepúlveda, Salas did not believe that Sepúlveda had a serious medical condition; he believed that Sepúlveda was "making things up." Docket # 59, p. 116. After Salas displayed a text message from Caribbean's Director of Human Resources saying that attendance to the seminar was mandatory, Sepúlveda fell into an emotional crisis, started crying, and called his father to pick him up from work. Sepúlveda was ultimately excused from attending this seminar as well as similar seminars scheduled for October 2012 and April 2013. Taking as true Sepúlveda's account of the incident, it is insufficient to establish an adverse employment action. Although Salas' approach may have been somewhat rude or insensitive, "a supervisor's unprofessional managerial approach and accompanying efforts to assert

---

[5] According to google maps, it takes approximately less than an hour without traffic to drive from Plaza Centro Shopping Center to Guayama.

her authority are not the focus of the discrimination laws." Lee-Crespo, 354 F.3d at 47; see also Colón-Fontánez, 660 F.3d at 45 (calling the plaintiff a hypochondriac or claiming that she was "faking it," among others, was insufficient to establish an objectively hostile or abusive environment).

According to Sepúlveda, Salas went further and transmitted his disbelief in Sepúlveda's condition to other employees. Sepúlveda claims that this had dire consequences; one time, he "was forced" to pull down his pants to show a restaurant manager that he had a skin condition that required immediate medical attention. Sepúlveda, however, did not provide sufficient details surrounding this incident. Although he might have felt compelled to pull down his pants, there is no evidence that demonstrates, from an objective standpoint, that he "was forced" to do so. Moreover, although the incident may have produced some discomfort, Sepúlveda does not explain how his supervisor's disbelief regarding a condition for which he had requested no accommodation nor provided any medical evidence before was related to a protected activity.

Next, Sepúlveda states that Salas and other managers began to call him a "cry baby." This allegation has several problems. To start, there is no evidence that Salas ever called Sepúlveda directly a "cry baby." In his deposition, Sepúlveda said only that on March 2012, an employee named Aida Rodríguez told him that Salas and one of the restaurant managers referred to him as the "cry baby." Docket # 41-2, p. 9. But this testimony is hearsay within hearsay. See Fed. R. Evid. 802-805. As such, it is inadmissible and thus insufficient to defeat summary judgment. See Fed. R. Civ. P. 56(c)(4). Sepúlveda points only to two other instances when he was called a "cry baby." The first in May 2012, by one his supervisors, and the second in December by an employee named Angelise. See Docket # 41-2, pp. 9-10. It is unclear whether these statements were related to a protected activity or to some other workplace issue. But assuming that the comments were related to Sepúlveda's request for accommodation or his filing of EEOC charges, these three isolated incidents are insufficient to

constitute retaliation under the ADA. The case law is clear that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not amount to adverse employment action, not even to establish an objectively hostile or abusive work environment. Colón-Fontánez, 660 F.3d at 44 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))(internal quotations omitted); see also Brown v. Advocate S. Suburban Hosp., 700 F.3d 1101, 1108 (7th Cir. 2012) (finding that "being called a trouble maker, a cry baby, or a spoiled child" would not "dissuade a reasonable person from complaining of discrimination").

Sepúlveda also complains that he was forced to take paid vacation leave until he took and passed the ServSafe examination.[6] He points out that he had been working with an expired certificate for some time and alleges that other employees were permitted to work with an expired certification. True, Caribbean allowed Sepúlveda to work with an expired certificate after he returned from medical leave at the SIF. Yet, this does not necessarily mean that it had to continue allowing him to work without a valid certificate. In this regard, it is uncontested that Caribbean required at least one managerial staff, such as Sepúlveda, in each restaurant to have a ServSafe certificate. Otherwise, Caribbean maintains, it could get in trouble with the Puerto Rico Department of Health. It is also uncontested that sometimes Sepúlveda was the only managerial staff at his restaurant.

Sepúlveda provides no legal authority to support his suggestion that forced vacation under these circumstances constitutes an adverse employment action. Arguably, this could be indicative of retaliation in the form of disparate treatment if Sepúlveda was the only employee forced to take vacation under similar circumstances. But Sepúlveda proffers no competent evidence to support his allegation that other managerial employees were allowed to work with expired certificates. Moreover, he makes no effort to explain how the forced vacation with pay under these circumstances

---

[6] The record does not reveal how long Sepúlveda on vacation leave but he was paid eighty hours for this.

produced "a significant, not trivial, harm," Carmona-Rivera, 464 F.3d at 20; one that would discourage a reasonable person from complaining of discrimination. See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68

Sepúlveda also claims that Caribbean tried to force him to stay in the restaurant until 11:00 p.m. This happened around January 2013; right after the Puerto Rico Department of Health closed the restaurant due to a cockroach infestation problem. Then, Caribbean requested all managers, including Sepúlveda, to remain two hours after closing to make sure that the restaurant was properly cleaned. Docket # 59, ¶ 67. Sepúlveda says that he was the only manager required to stay until 11:00 p.m. Notwithstanding, it is uncontested that Sepúlveda stayed until 11:00 p.m. only once. Id., ¶ 68. He says that he was subsequently admonished verbally for not staying until 11:00 p.m. but provides no details regarding the severity of the alleged admonishment and his disciplinary record was not affected. In short, Sepúlveda failed to show that the alleged admonishment produced harm significant enough to constitute a retaliatory adverse employment action.

Lastly, Sepúlveda timidly floats the idea that he "was subject to differential treatment in working hours' requirements, in labor assignment, in understaffing of the shift he supervised, [and] in being subject to constant verbal warnings." Docket # 44, p. 17. Following this conclusory statement, he references fifty paragraphs of his additional statement of uncontested facts without even bothering to specify which paragraphs contain the relevant facts as to each of the four types of disparate treatment alleged therein. Id. Not surprisingly, Sepúlveda fails to discuss any case law to support his contention. Instead, in a separate section, he recites boiler plate law regarding retaliation claims under the ADA without explaining how it applies to the particular facts of this case. Id., pp. 17-20. "Simply noting an argument in passing without explanation is insufficient to avoid waiver." Rocafort, 334 F.3d at 121 (parenthetically quoting DiMarco–Zappa v. Cabanillas, 238 F.3d 25, 34 (1st Cir. 2001)). So is the recitation of applicable law unaccompanied "by an explanation of how the law applies

to the facts of the particular case." MicroStrategy Inc. v. Bus. Objects Americas, 238 F. App'x 605, 610 (Fed. Cir. 2007) (unpublished). The Court need not entertain such an ill-developed argument because "'developing a sustained argument out of…legal precedents' is the parties' job, not the court's." Perfect Puppy, Inc. v. City of E. Providence, R.I., 807 F.3d 415, 418 (1st Cir. 2015) (parenthetically quoting Town of Norwood v. F.E.R.C., 202 F.3d 392, 405 (1st Cir. 2000)).

Summing up, none of the incidents described above constitutes an actionable adverse employment action for purposes of Sepúlveda's retaliation claim. Nevertheless, "retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." See Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 199 (1st Cir. 2011) (Parenthetically quoting Billings v. Town of Grafton, 515 F.3d 39, 54 n. 13 (1st Cir. 2008)).

To succeed on a hostile work environment claim, Sepulveda must prove that "that [his] workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ... [his] employment and create an abusive working environment.'" Colón–Fontánez, 660 F.3d at 43 (quoting Quiles–Quiles, 439 F.3d at 7). "This standard cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." Suárez, 229 F.3d at 54. Instead, the plaintiff must show that the harassment was both "objectively and subjectively offensive, [such] that a reasonable person would find hostile or abusive," and that the plaintiff in fact perceived it to be so. Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)). In assessing whether the harassment is actionable, courts consider the totality of the circumstances including "the severity of the conduct; its frequency; and whether it unreasonably interfered with the victim's work performance." Colón-Fontánez, 660 F.3d at 44.

The incidents that Sepúlveda deemed important enough to specifically address in opposition to Caribbean's motion amount to two incidents involving rude behavior by Salas; an incident were Sepúlveda had to demonstrate to an incredulous supervisor that he needed medical attention; two isolated incidents of employees calling him a "cry baby"; a short period of paid vacation leave; and once having to stay an additional hour to supervise cleaning shortly after his restaurant was closed due to an infestation problem. Collectively, these incidents amount to nothing more than the petty insults and minor annoyances which are insufficient to constitute an adverse employment action under the ADA. Colón-Fontánez, 660 F.3d at 36–37. Drawing all reasonable inferences in his favor, Sepúlveda did not demonstrate from an objective standpoint, that Caribbean's actions were sufficiently severe or pervasive to sustain a retaliatory hostile work environment claim, and so it fails.

    c. Supplemental Claims

Caribbean also moves the Court to dismiss Sepúlveda's supplemental claims under Puerto Rico's counterpart to the ADA, Law No. 44 of July 2, 1995, P.R. Laws Ann. tit. 1, §§ 501 et seq., the Commonwealth's anti-retaliation statute, Law No. 115 of December 20, 1991, 29 P.R. Laws Ann. § 194a(a), and their tort claims under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 & 5142.

When deciding whether to exercise jurisdiction over state law claims, district courts must exercise "informed discretion," weighing "concerns of comity, judicial economy, convenience, and fairness." Redondo Const. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011). "[I]n the *usual* case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (2010) (italics in the original). Because Caribbean did not address the applicable factors as they relate to the case at hand, the Court follows

the general rule and declines to exercise supplemental jurisdiction over the Commonwealth law claims. These claims are therefore dismissed without prejudice.

## IV. Conclusion

Caribbean's motion for summary judgment is granted. Judgment shall be entered dismissing Sepúlveda's federal claims with prejudice and his supplemental claims without prejudice.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2016.

*s/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge